Anna I. Woodworth v. Commissioner. George B. Fraser and Rayma M. Fraser (Husband and Wife) v. Commissioner. Mollie L. Chorpening v. Commissioner.
Woodworth v. Commissioner
Docket Nos. 30364-30366.
United States Tax Court
1953 Tax Ct. Memo LEXIS 77; 12 T.C.M. (CCH) 1265; T.C.M. (RIA) 53351; October 30, 1953
L. F. Loux, Esq., 525 N.B.C. Building, Cleveland, Ohio, for the petitioners. James F. Kennedy, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of the petitioners for the calendar year 1945 in the following amounts: Docket No.
Petitioner
Deficiency
30364
Anna I. Woodworth
$16,845.60
30365
George B. Fraser and
Rayma M. Fraser
10,484.88
30366
Mollie L. Chorpening
6,939.75
The only issue for determination is whether the petitioners realized a taxable dividend in 1945 as the result of a transaction in which they surrendered to a corporation certain shares of its stock and received in exchange therefor the corporation's cancellation of certain notes owing by them to it. Findings *78 of Fact Part of the facts were stipulated and are found accordingly. Other facts are found from the oral evidence. Anna I. Woodworth, George B. and Rayma M. Fraser, and Mollie L. Chorpening reside in Conneaut, Ohio. They filed their income tax returns for the calendar year 1945 with the collector of internal revenue for the 18th collection district of Ohio at Cleveland, Ohio. The Buckeye Stamping Company, sometimes hereinafter referred to as Buckeye, is an Ohio corporation which was organized prior to 1913. Its capital structure at the time of organization consisted of 200 shares of common stock of a par value of $100 each. All the stock was issued at par value. On May 9, 1916, Buckeye split its outstanding 200 shares of common stock, five for one, and issued 800 additional shares. Thereafter it had 1,000 shares outstanding. On December 19, 1922, it split its outstanding 1,000 shares, two for one, issued 1,000 additional shares and thereafter had 2,000 shares outstanding. At the same time Buckeye transferred $180,000 from its earned surplus account to its capital account. Prior to September 1943 Earle C. and Lillie G. Derby together held 90 per cent of Buckeye's outstanding *79 stock. Earle C. Derby died May 21, 1943, and his widow, Lillie G. Derby, was appointed executrix of his estate. The other 10 per cent of Buckeye's stock at the time of Derby's death was owned as follows: Shares
E. R. Clapham
60
Helen Lamborn
60
Charlotte Morningstar
60
B. L. Brockerman
10
Edna Hugoniot
10
Total
200 On September 4, 1943, Lillie G. Derby, individually and as executrix of the estate of Earle C. Derby, executed the following agreement: "AGREEMENT "This Agreement made and entered into, in triplicate, at Columbus, Ohio, this 4th day of September, 1943, by and between Lillie G. Derby, individually, and/or Lillie G. Derby, Executrix of the Estate of Earle C. Derby, deceased, of Columbus, Ohio, Parties of the First Part, hereinafter called 'First Parties', and Floyd W. Bell, J. R. Perkins, G. B. Fraser, A. C. Jahn, Earl W. Hosler and F. H. Woodworth, all of Columbus, Ohio, Parties of the Second Part, hereinafter called 'Second Parties', Witnesseth: "Whereas, First Parties are the owners of, or have control and power of sale of, eighteen hundred (1800) shares of the common stock of the Buckeye Stamping Company, of Columbus, Ohio, hereinafter *80 called 'Company', and are desirous of selling the same; and "Whereas, Second Parties, having fully examined the assets, plant, equipment and business of said Company and having expressed their satisfaction therewith, have made an offer to First Parties to purchase all of said common stock now owned by or under the control of First Parties, as well as the stock of other stockholders if they desire to sell; "Now, Therefore, in consideration of the sum of Five Thousand Dollars ($5,000), paid by Second Parties to First Parties, the receipt of which is hereby acknowledged, and in further consideration of the agreements and covenants hereinafter set forth, it is mutually agreed by and between the parties hereto, as follows: - "(1) First Parties hereby sell to Second Parties, and Second Parties hereby purchase from First Parties, said (1800) eighteen hundred shares of the said common stock of said Company, and, on or before the 15th day of October, 1943, First Parties agree to deliver and set over to Second Parties, or their nominees, the said (1800) eighteen hundred shares of the said common stock of said Company, properly endorsed. "(2) Concurrently with the transfer and delivery *81 of said common stock, Second Parties agree to pay therefor to First Parties the sum of Three Hundred Six Thousand Dollars ($306,000.00) in cash, with a credit, of course, for the preliminary payment of Five Thousand Dollars ($5000.00). "(3) First Parties agree that prior to the consummation of said sale and purchase the said Lillie G. Derby and her attorney, James M. Butler, will resign as directors and/or as officers of said Company, and that they will secure the resignation of the other directors and officers of said Company. "(4) First Parties further agree that upon the consummation of said sale and purchase by the payment of said purchase price and the delivery of said shares, possession of the assets of said Company shall forthwith be delivered to Second Parties. "(5) First Parties further agree that the present personnel of said Company shall be retained until the consummation of said sale and purchase and that all normal operations of said Company shall be continued along present lines, without the declaration of any dividends or the contracting of any debts except along the normal lines of operation, to the end that the assets of the Company as of May 31, 1943, shall *82 not be depleted except by the fluctuations of the securities market, by ordinary wear and tear and/or by the normal operations of the business, payment of taxes and the like. "(6) First Parties hereby grant to Second Parties the privilege of examining the abstracts of title to any real property owned by said Company and also to enter the premises of said Company during normal business hours for the purpose of making an appraisal or audit of the assets thereof. "(7) It is mutually agreed that should said Second Parties fail or refuse to purchase and pay for said stock as herein stipulated, First Parties shall retain the said Five Thousand Dollars ($5,000) deposited herewith and apply the same on the damages caused First Parties by said failure of Second Parties which it is agreed will be at least Five Thousand Dollars ($5,000). If said sale and purchase be consummated in accordance with the terms hereof said consideration shall be applied as part of the purchase price as hereinbefore stated. "(8) First Parties will make every reasonable effort to secure agreements from the remaining shareholders of said Company to sell their respective shares to Second Parties for the sum of One *83 Hundred Seventy Dollars ($170.00) per share and, as part of the consideration of this agreement, Second Parties hereby agree to purchase all or any part of said remaining shares (a total of two hundred (200) shares) at such price, provided however, that this Agreement to purchase said eighteen hundred (1800) shares is in no way dependent upon the purchase or sale of said remaining shares. "(9) The First Parties further promise that they will make every reasonable and diligent effort to persuade the present officers and employees to remain with the Company under the new management. "In Witness Whereof, Lillie G. Derby, individually, and Lillie G. Derby as Executrix of the Estate of Earle C. Derby, deceased, First Parties, and Floyd W. Bell, , , and , Second Parties, have signed their names to triplicates hereof on the day and year first above written. "In the Presence of
S/ Lillie G. Derby
Lillie G. Derby
S/ Lillie G. Derby
Lillie G. Derby, Ex-
S/ Alan J. Stark
ecutrix of the Estate
of Earle C. Derby,
deceased.
S/ T. E. Talmadge
First Parties
S/ J. R. Perkins
S/ F. W. Bell
S/ A. C. Jahn
S/ R. T. Schotten-
berg
S/ Earl W. Hosler
S/ M. C. McCann
S/ F. H. Wood-
worth
S/ G. B. Fraser
Second Parties"
*84 Pursuant to the above agreement, Lillie G. Derby received a cashier's check for $5,000 issued on September 10, 1943, by The Northern Savings Bank of Columbus, Ohio. This amount was borrowed by the second parties to the agreement from unidentified sources. In further pursuance of the agreement, all stockholders, other than Lillie G. Derby, sold their stock, totaling 200 shares, on September 11, 1943, to F. W. Bell, G. B. Fraser, Earl W. Hosler, A. C. Jahn, J. R. Perkins, and F. H. Woodworth, sometimes hereinafter referred to as syndicate members. The shares were purchased for $170 per share and paid for by cashier's check issued by The Northern Savings Bank of Columbus, Ohio. As of September 13, 1943, the members of the board of directors of the Buckeye Stamping Company were: James M. Butler E. R. Clapham G. L. Brockerman Lillie G. Derby R. E. Williams The officers elected at the last election of officers of the corporation were: President
Earle C. Derby
Vice President
E. R. Clapham
Secretary
G. L. Brockerman
Treasurer
Earle C. Derby On September 13, 1943, all of the directors resigned and G. L. Brockerman also resigned as secretary. E. R. Clapham *85 remained as vice president. A new board of directors, consisting of F. W. Bell, Earl W. Hosler, George Fraser, J. R. Perkins and Tom L. Wheeler, Jr., was elected at a special meeting of the stockholders held at 1:00 p.m. on September 17, 1943. Thereafter, on the same day, the board approved the sale of certain securities of an approximate value of $193,000 which were on that day delivered by Buckeye to The Huntington National Bank of Columbus, Ohio. The Huntington National Bank issued a cashier's check on the same day, September 17, 1943, payable to Buckeye for $175,000. This check was endorsed by Buckeye, E. R. Clapham, vice president, to Lillie G. Derby, individually, and as executrix, delivered to her and cashed by her on the same day. On September 20, 1943, the bank issued to Buckeye its check for $13,551.33, representing the balance due from the sale of the securities and transmitted it to F. W. Bell. The remainder of the purchase price owing to Lillie G. Derby was paid to her as follows: by a draft, dated September 17, 1943, for $76,000, drawn by The Northern Savings Bank of Columbus, Ohio, on The Huntington National Bank of Columbus, made payable to her and a cashier's *86 check for $50,000 payable to her issued by The Ohio National Bank of Columbus, Ohio, on September 17, 1943. The Buckeye Stamping Company issued its check, dated September 17, 1943, for $50,000 to The Ohio National Bank of Columbus, Ohio. Part of the funds used in effecting the change in ownership of the stock in Buckeye were acquired through loans made to Buckeye by Bell Sound System, Inc., and by The Northern Savings Bank in the amounts of $75,000 and $20,000, respectively. After Lillie G. Derby was paid for the 1,800 shares of Buckeye stock held by her, the certificates for the stock were surrendered to Buckeye and cancelled. On September 17, 1943, the parties listed below executed and delivered to Buckeye their personal notes in the following amounts: Floyd W. and Madeline M. Bell
$136,000
George B. and Rayma M. Fraser
34,000
Earl W. and Dorothy E. Hosler
29,750
A.C. and Lura Bell Jahn
34,000
J.R. and Olive N. Perkins
34,000
Tom L. and Mary P. Wheeler
4,250
Floyd and Anna I. Woodworth
68,000
Total
$340,000 Subsequently, in November or December 1943, Buckeye issued certificates in the names of the following persons for the indicated number of shares *87 of its stock, but never delivered them: Stockholder
Shares
Madeline M. Bell
800
A. I. Woodworth
400
Rayma M. Fraser
200
A.C. and L. B. Jahn
200
Olive N. Perkins
200
Dorothy E. Hosler
175
Mary P. Wheeler
25
Total
2,000 The stock certificates were held by Buckeye as security for the payment of the abovementioned notes. On or about August 16, 1944, Mollie L. Chorpening and her husband, C. M. Chorpening, purchased the 200 shares of Buckeye stock which at that time stood in the name of Olive N. Perkins. At the time of the purchase, Mollie L. Chorpening and her husband executed their personal note for $30,260 in favor of Buckeye and delivered it to the company to replace the note of J.R. and Olive N. Perkins. The makers of the notes reduced their obligations at various times from September 1943 to the end of 1945 as follows: Payments
Payments
Payments
Original
December
December
December
Note
1943
1944
1945
Total
Mayme Fraser
$ 34,000
$ 3,740.00
$ 3,069.00
$ 1,600
$ 8,409.00
Anna I. Woodworth
34,000
3,740.00
3,069.00
1,600
8,409.00
Anna I. Woodworth
34,000
3,740.00
3,069.00
1,600
8,409.00
J. R. Perkins *
34,000
3,740.00
3,740.00
Mollie L. Chorpening *
3,069.00
1,600
4,669.00
A.C. and Lora Bell Jahn
34,000
3,740.00
3,069.00
1,600
8,409.00
Mary P. Wheeler
4,250
467.50
383.62
200
1,051.12
Dorothy B. Hosler
29,750
3,272.50
2,685.38
1,400
7,357.88
M. M. Bell
136,000
14,960.00
12,276.00
6,400
33,636.00
$340,000
$37,400.00
$30,690.00
$16,000
$84,090.00
*88 The following is a comparative balance sheet showing the financial condition of the Buckeye Stamping Company at the end of the calendar years 1942-1944, inclusive, as prepared by officers of Buckeye: 1942
1943
1944
ASSETS
Current Assets: Cash on hand and in bank
$ 60,219.89
$ 14,653.57
$ 3,320.80
Accounts receivable
2,125.66
40,005.34
10,684.91
Inventory
37,536.83
24,187.25
39,486.10
Prepaid insurance
945.92
2,129.08
5,923.06
U.S. Treas. Notes - Ser. B
2,005.60
Total
$100,828.30
$ 82,980.84
$ 59,414.87
Investments: Govt. bonds (at cost)
$160,055.13
Other bonds (at cost)
18,395.25
Corporate securities (at cost)
17,541.50
Total
$195,991.88
Other Assets - Notes receivable
$302,600.00
$275,400.00
Fixed Assets: Machinery and equipment
$ 3,753.75
$ 10,947.15
Dies and tools
1,704.94
1,704.94
Furniture and fixtures
1,047.60
2,298.87
Building
77,768.66
74,879.19
Land
3,935.85
3,935.85
Heating system
9,198.13
Electric system
4,497.16
Total
$ 88,210.80
$107,461.29
Less reserves for depreciation: Machinery and equipment
$ 2,090.70
$ 2,825.74
Dies and tools
426.23
852.46
Furniture and fixtures
101.79
269.11
Building
55,202.14
56,816.25
Heating system
459.89
Electric system
224.85
Total
$ 57,820.86
$ 61,448.30
Total Fixed Assets
$ 38,693.33
$ 30,389.94
$ 46,012.99
Total Assets
$335,513.51
$415,970.78
$380,827.86
LIABILITIES
Current Liabilities: Accounts payable
$ 932.00
Notes payable
$ 95,000.00
Accrued income tax
33,347.03
Accrued other taxes
$ 1,549.19
4,067.51
4,947.79
Total
$ 1,549.19
$ 99,067.51
$ 39,226.82
Fixed Liability - Mortgage
15,000.00
Total Liabilities
$ 1,549.19
$ 99,067.51
$ 54,226.82
Net Worth: Capital stock
$200,000.00
$200,000.00
$200,000.00
Surplus
133,964.32
116,903.27
126,601.04
Total
$316,903.27
$326,601.04
Total Liabilities and Net Worth
$335,513.51 *
$415,970.78
$380,827.86
*89 In the latter part of 1945 Buckeye's legal counsel advised the company that in his opinion the issuance of stock for notes constituted an illegal act. Acting on this advice, the persons in whose names stock certificates had been issued on December 31, 1945, surrendered 75 per cent of the number of shares standing in their respective names and received credit on their notes at the rate of $170 per share. Such credit was given by cancellation of note obligations held by the company, plus or minus certain small cash adjustments. The amount of notes cancelled and the stock of Buckeye outstanding on December 31, 1945, were as follows: Credit on notes
Total
by sale of
shares
stock
held
Mayme Fraser
$ 25,500.00
50
Anna I. Woodworth
25,500.00
50
Anna I. Woodworth
25,500.00
50
Mollie L. Chorpening
25,500.00
50
A.C. and Lora Bell Jahn
25,500.00
50
Mary P. Wheeler
3,187.50
6 1/4
Dorothy B. Hosler
22,312.50
43 3/4
M. M. Bell
102,000.00
200
Total
$255,000.00
500
An analysis of the accumulated surplus of Buckeye Stamping Company is as follows: *90 Earnings Source
Nontaxable
Taxable
Total
As of January 1, 1913
$147,644.82
$ 0.00
$147,644.82
Profits for January and February 1913 based
on proration of total earnings for 1913
2,032.45
0.00
2,032.45
Profits from March 1, 1913, to Dec. 31, 1913,
based on proration of total earnings for 1913
0.00
10,162.27
10,162.27
TOTAL
$149,677.27
$ 10,162.27
$159,839.54
Less: Dividend paid 4/24/13 prorated over period
1/1/13 to 4/24/13
$ 4,165.85
$ 1,804.15
$ 5,970.00
Less: Dividend paid 12/29/13
0.00
5,970.00
5,970.00
Surplus as of 1/1/14
$145,511.42
$ 2,388.12
$147,899.54
Accumulated earnings after taxes from 1/1/14
to 12/31/45 including $180,000 of nontaxable
stock dividends
0.00
167,515.28
167,515.28
Surplus as of 12/31/45 before 1945 dividends
$145,511.42
$169,903.40
$315,414.82
Respondent determined that the $255,000 in notes cancelled by Buckeye on December 31, 1945, was a taxable dividend to the extent of the surplus of $169,903.40. Of the $95,000 borrowed by the Buckeye Stamping Company in September 1943, and used by the petitioners' syndicate to purchase the stock of said company held by Lillie G. Derby, *91 all but $15,000 had been repaid at the end of 1944, and no part of the liability existed at the time of the stock redemption on December 31, 1945. On June 24, 1947, respondent notifed Buckeye that he had determined deficiencies in income taxes for 1942, 1944 and 1945 in the total amount of $11,623.44. Part of the deficiencies was based on a determination by respondent that, because of an accumulation of surplus beyond the reasonable needs of the business in 1942 and 1944, Buckeye was subject, for those years, to the surtax imposed by section 102 of the Internal Revenue Code. A petition was filed with this Court. The proceeding was settled by a stipulation of the parties showing a deficiency of $8,514.95. Petitioners, as members of a syndicate or purchasing group, joined together to buy, and did buy in 1943, all of the outstanding common stock of the Buckeye Stamping Company from its former stockholders. Opinion The primary question is whether petitioners realized a dividend when notes given by them for the purchase of Buckeye stock were cancelled and the shares of the corporation held as security for the notes were surrendered. Section 115(g) of the Internal Revenue Code *92 provides that if a corporation cancels or redeems its stock at such time and in such manner as to make the distribution and cancellation or redemption essentially equivalent to a taxable dividend, the amount so distributed, to the extent that it represents a distribution of earnings or profits, shall be treated as a taxable dividend. The cases on this question hold that the application of section 115(g) of the Code depends primarily on the facts of each case. Pullman, Inc., 8 T.C. 292, 298. The net effect of distribution, rather than motives and plans of a taxpayer, is the fundamental test in determining whether the transaction comes within the ambit of section 115(g). Flanagan v. Helvering, 116 Fed. (2d) 937. The petitioners' first contention is that the syndicate purchased only the operating assets and did not acquire the surplus of the corporation wherewith to make a distribution to petitioners. In support of this contention they rely upon the following statements which they urge must be accepted as proven facts: (1) That Lillie G. Derby while having control of Buckeye converted securities owned by it into cash and used the cash to purchase the major *93 portion of the stock owned by her, leaving only the operating assets, and (2) that the agreement entered into on September 4, 1943, by her and Floyd W. Bell, J. R. Perkins, G. B. Fraser, A. C. Jahn, Earl W. Hosler, and F. H. Woodworth, sometimes referred to as the syndicate members, was not the basis on which the syndicate eventually took over the business and assets of Buckeye; that this fact is borne out because the check for the down payment of $5,000 provided for in the agreement was not issued until September 10, 1953, whereas the agreement acknowledged receipt of the payment of the $5,000 as of the 4th day of September 1943. It is difficult to reconcile the position taken by petitioners with what actually occurred. First, the syndicate members on September 4, 1943, entered into an agreement with Lillie G. Derby which recited her sale and their purchase of the 1,800 shares of stock held by her for $306,000, or at $170 per share. The agreement further provided that she would make every reasonable effort to secure agreements from the minority stockholders, that is, the holders of the remaining 200 shares, to sell their stock to the syndicate members at the same price per share. *94 The agreement also provided that, prior to the consummation of the sale of the stock by Lillie G. Derby to the syndicate members, she and her attorney would resign as directors and officers of Buckeye and that they would secure the resignation of the other officers and directors. The agreement also provided, on the part of Lillie G. Derby, that until consummation of the sale of stock by her, the normal operations of Buckeye should be continued along then existing lines and "without the declaration of any dividends." We are unable to conclude from the record that the syndicate members and Lillie G. Derby ever set aside the agreement of September 4, 1943, and entered into a new one with other and different provisions. The facts of record sustain the view that what was done was pursuant to the agreement of September 4, 1943. On September 11, 1943, the minority stockholders of Buckeye sold their stock to the syndicate members and received payment therefor at $170 per share. On September 13, 1943, all the directors and one of the two living officers of Buckeye resigned. Apparently the action of Clapham, the vice president, in not resigning was due to the request of the syndicate members. *95 While it is true that the $5,000 down payment provided for in the agreement was not paid to Lillie G. Derby until September 10, 1943, no explanation is given by petitioners as to why it was made on that day instead of some other. We assume petitioners have particular knowledge as to this matter as they were the payors. So far as appears from the record it may well be that the time intervening between the making of the agreement of September 4th and the payment on September 10th was required by the syndicate members to obtain the funds. The fact that the down payment was not made until September 10th standing alone does not require the conclusion that an agreement containing provisions other and different from those contained in the agreement of September 4th was the one under which Lillie G. Derby parted with the stock held by her. On September 17, 1943, a new board of directors of Buckeye was elected. This board consisted principally of syndicate members. After its election, and on the same day, the board approved the sale of securities owned by Buckeye to obtain funds which were used on that date, September 17, 1943, as part of the down payment to Lillie G. Derby for the stock *96 held by her. The effect of this transaction was to create a loan of such funds to the syndicate members. Furthermore, on September 17, 1943, the syndicate members executed notes to Buckeye in varying sums, but totaling $340,000 which was the total amount paid for the 2,000 shares of stock in Buckeye. Subsequently, certificates were issued for shares of stock in Buckeye in amounts which when multiplied by $170 per share equalled the amount of the respective notes. Buckeye held these certificates as security for the payment of the notes. If the syndicate members purchased only the operating assets of Buckeye, as petitioners contend, it would appear that their notes would have been given for the net book value of those assets, about $138,000, instead of the total amount of $340,000 received by Lillie G. Derby and the minority stockholders for their stock. Furthermore, during the remainder of 1943 and throughout 1944, Buckeye's books continued to show its outstanding stock at $200,000 (2,000 shares of a par value of $100 each). The syndicate members' notes were shown as assets and a surplus of approximately $117,000 was shown at the end of 1943 and approximately $126,000 at the end of *97 1944. Also, Buckeye joined in stipulating deficiencies in its income tax for 1942 and 1944 which, in part, consisted of surtax under section 102. The foregoing action of Buckeye is more consistent with the conclusion that Buckeye retained its surplus rather than that it was distributed to Lillie G. Derby. In further support of their contention that the syndicate members were not the purchasers of the stock held by Lillie G. Derby, the petitioners point to a resolution adopted by Buckeye's board of new directors at its meeting held on September 17, 1943. The minutes of that meeting recite that Lillie G. Derby had sold to Buckeye 1,800 shares of its stock at $170 per share and that it did not appear that formal authority for such transaction had been given by the board of directors. The minutes further recite the adoption of a resolution by the directors ratifying and approving such purchase and directing that said shares be held by Buckeye as treasury stock. In addition, the petitioners offered in evidence two undated instruments purporting to be assignments to Buckeye by Lillie G. Derby of the 1,800 shares of stock in question. The petitioners offered no evidence as to the date *98 when, or the circumstances under which, the assignments were executed. Since under the agreement of September 4, 1943, the syndicate members purchased the stock in question and Lillie G. Derby had agreed, upon receipt of payment in full for it, to transfer it to the syndicate members, or their nominees, it may well be that the assignments in question were made in form to Buckeye at the request of the syndicate members. Although the minutes of the new board of directors of Buckeye adopted on September 17, 1943, recite that Lillie G. Derby had sold to Buckeye the shares held by her in it and recite the ratification of such sale, they further recite that such stock was to be held by Buckeye as treasury stock. If the foregoing recitals correctly represented what had actually transpired, the question arises as to why on the same date, September 17, 1943, the syndicate members executed their notes to Buckeye for the total amount of $340,000, the amount received by Lillie G. Derby and the minority stockholders for their stock. If Buckeye had purchased the stock, it would have been the property of Buckeye and there would have been no occasion for the syndicate members to execute their promissory *99 notes in any amount to Buckeye. Furthermore, so far as shown, Buckeye never at any time recorded or carried on its books as treasury stock the 1,800 shares in question. In view of what has been said above, it is our conclusion that the stock Lillie G. Derby held in Buckeye was purchased by the syndicate members who used funds or other assets of Buckeye for making payment therefor. Having reached the foregoing conclusion, it becomes unnecessary to consider another contention of the petitioners predicated on the position that Buckeye acquired the stock from Lillie G. Derby and then reissued it to syndicate members, or their nominees, for unenforceable promissory notes. Finally, the petitioners contend that section 115(g) of the Code is without application here since the surrender to Buckeye of the shares in controversy was prompted by a substantial business purpose, namely, the advice of Buckeye's counsel that the shares had been illegally issued by Buckeye to the syndicate members, or their nominees, and the notes were unenforceable. Having heretofore concluded that the syndicate members acquired the shares in question from Lillie G. Derby and not from Buckeye, it becomes unnecessary *100 to consider this contention. However, we observe that an equally plausible, if not more plausible, reason for a surrender of the shares and the cancellation of the notes was that by the end of 1945 Buckeye had repaid the $95,000 it had borrowed in connection with the transaction in which the syndicate members had acquired the shares, and it was no longer economically necessary for Buckeye to require payment of the notes. The number of shares surrendered and the amount of notes cancelled were in such proportions as to effect no change in the relative position of the stockholders to the corporation. Thereafter dividend distributions would be made in the same relative proportions as theretofore. The net effect of the transactions is that the syndicate members purchased the stock from Lillie G. Derby and the minority stockholders, and two years later the syndicate members, or their nominees, surrendered a portion of the stock to the corporation and it cancelled their notes. There were two separate transactions. The stock surrender transaction was not in the contemplation of the syndicate members at the time of their purchase of the Derby stock. It came about only because of advice of *101 their tax counsel some two years thereafter. The tax consequences depend on what was done, not what could have been done. Wall v. United States, 164 Fed. (2d) 462. The respondent correctly determined that the cancellation of the notes resulted in taxable income to the petitioners. Decisions will be entered for the respondent. Footnotes
*. Perkins' interest acquired by Chorpening.↩
*. Exhibit 20-T shows this amount as $335,991.51. No explanation is given for this difference.↩